Filed 2/1/22

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THOMAS AHERN et al., | B309935 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC484356) |
| v. | |
| ASSET MANAGEMENT CONSULTANTS, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Buckley and Ann I. Jones, Judges. Reversed and remanded with directions.

Catanzarite Law Corporation, Kenneth J. Catanzarite, Nicole M. Catanzarite-Woodward and Eric V. Anderton for Plaintiffs and Appellants Thomas Ahern and Amlap Ahern, LLC.

Jackson Tidus and Charles M. Clark for Defendants and Respondents Asset Management Consultants, Inc., BH & Sons, LLC and James R. Hopper.

_____

The superior court granted the petition filed by Asset Management Consultants, Inc. (AMC), BH & Sons, LLC and James R. Hopper (collectively BH parties) to confirm an arbitration award dismissing the investment fraud claims of Thomas Ahern and Amlap Ahern, LLC (collectively Ahern parties) as barred by the governing statutes of limitation; denied the Ahern parties' petition to vacate or correct the award; and entered judgment in favor of the BH parties. The arbitration was conducted pursuant to the arbitration provision in the cotenancy agreement between BH & Sons, on the one hand, and tenant in common investors in commercial property located on East La Palma Avenue in Anaheim (the Amlap property), including Amlap Ahern, on the other hand.

On appeal the Ahern parties contend arbitration should not have been compelled because the cotenancy agreement was void as an unlawful contract to provide services requiring a real estate broker's license, which BH & Sons did not (and could not) have, and, in any event, their investment fraud claims were outside the scope of that agreement's arbitration provision. Ahern separately contends he was not a party to the cotenancy agreement and should not have been compelled to arbitrate his dispute with the BH parties. Even if arbitration was properly ordered, the Ahern parties argue, the award should have been vacated under Code of Civil Procedure section 1286.2, subdivision (a)(4) and (5), because the arbitrator exceeded his powers by applying a statute of limitations not authorized by California law and refusing to hear material evidence relating to the BH parties' limitations defense.

We agree the Ahern parties' claims were not within the scope of the arbitration provision in the cotenancy agreement, reverse the judgment and remand with directions to the trial

2

court to deny the petition to confirm the arbitration award and to grant the Ahern parties' petition to vacate the award.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Tenant in Common Investment*

Based on tax advice from their lawyers and accountants, Ahern and his wife, Priscilla Ahern,[1] sold a fractional tenant in common interest in property on South Robertson Boulevard in Los Angeles in mid-2006 and reinvested a portion of the net proceeds from that sale in a tenant in common interest in the Amlap property, an office building in Anaheim, which had been acquired by BH & Sons from iStar CTL I (iStar) to market to tax-motivated investors.[2]

BH & Sons and its manager, AMC,[3] provided preliminary information to qualified sophisticated investors in connection with the investors' evaluation of the property. After receiving that information, interested investors were provided with a property information package (or private placement memorandum) with due diligence and underwriting material and a tenant in common purchase and sale agreement. Both the property information package and the purchase and sale agreement stated the purchase price for the Amlap property was $34,550,000. The property information package also disclosed, "At closing, AMC will receive a real estate commission of One

---

[1] Priscilla Ahern was originally a plaintiff. She passed away while the litigation was pending.

[2] The reinvestments were to be done in accordance with Internal Revenue Code section 1031, a "1031 exchange."

[3] Hopper was an owner and the president of AMC.

3

Million, Three Hundred Thousand Dollars ($1,300,000) from the Seller."

The tenant in common purchase and sale agreement for direct investors like the Aherns provided BH & Sons was selling a property interest to the investor and assigning and transferring to the investor BH & Sons's rights and remedies under the iStar agreement with respect to the investor's property interest. Those investors were required to form their own single purpose limited liability companies to hold the investment. Amlap Ahern was the Aherns' limited liability company. Other investors in the Amlap property became limited partners in Amlap Venture, L.P., which then purchased a tenant in common interest in the property. Ultimately, Amlap Venture had 39 limited partners and owned a 24.17 percent interest in the property as a tenant in common; 13 newly formed limited liability companies owned remaining portions of the property as tenants in common. The tenants in common acquired the Amlap property through a combination of $12.6 million contributed by them and a loan from PNC Bank.

The venture performed according to expectations for approximately three years (through September 2009) when the lease of the sole tenant (Cingular Wireless) ended; no replacement tenant was found. The secured lender foreclosed on the Amlap property in May 2010, eliminating the tenant in common investors' interests.

2. *The Cotenancy Agreement*

The tenant in common investment in the Amlap property was managed and operated pursuant to the terms of a cotenancy agreement. That agreement, which defined BH & Sons as "Manager," recited that the cotenants "have agreed to join together as tenants in common to acquire, hold and operate

4

certain Property (defined below) for investment purposes" and declared, "The Cotenants desire to enter into this Agreement to arrange for the management and operation of the Property, and to govern the respective rights and obligations of each Cotenant." In a paragraph titled "Acquisition" the agreement further provided, "The Cotenants have agreed to jointly acquire and operate the property. The rights and obligations of the Cotenants shall be determined pursuant to this Agreement. The Cotenants do not intend by this Agreement to create a partnership or a joint venture, but merely to set forth the terms and conditions upon which Cotenants shall hold and manage undivided interests in the Property, and to meet the requirements of the holder of the Mortgage Loan."

Paragraph 2.3 of the agreement governed cotenant advances: "Upon Closing of the acquisition of the Property, each of the Cotenants shall deposit with the Manager or its designee such Cotenant's proportionate share of funds reasonably required by the Manager for Reserves." Paragraph 3.1 delegated management responsibility to BH & Sons: "Except as otherwise required by the Majority in Interest of the Cotenants or this Agreement, the Cotenants delegate responsibility for the management and supervision of the Cotenants' Ownership Interests in the Property, and all decisions concerning the business and affairs of the Property shall be made by the Manager."

Paragraph 9.7 provided California law applicable to contracts made and to be fully performed in California governed "[a]ll questions with respect to the construction of this

5

Agreement[4] and the rights and liabilities of the parties with respect thereto." Paragraph 9.8 required arbitration of disputes arising in connection with the Agreement: "Unless the relief sought requires the exercise of the equity powers of a court of competent jurisdiction, any dispute arising in connection with the interpretation or enforcement of the provisions of this Agreement, or the application or validity thereof, shall be submitted to arbitration."

The cotenancy agreement contained an integration clause. Hopper signed the agreement for BH & Sons as president of AMC, BH & Sons's manager. Ahern signed as president of Amlap Ahern.

3. *The Initial Iteration of Ahern's Lawsuit*[5]

Ahern initially filed this lawsuit in May 2012 against BH & Sons, AMC, Hopper and a number of others, including several affiliated attorneys and accountants, alleging in a 77-page, 16-cause-of-action putative class action complaint that he had been fraudulently induced to enter into the Amlap investment through the promotional materials developed and distributed by BH & Sons and AMC. Specifically, Ahern alleged the offering materials falsely represented the purchase price for the Amlap property was $34,550,000 and a $1.3 million

---

[4] "Agreement" was defined as "[t]his Cotenancy Agreement as originally executed and as amended from time to time."

[5] The history of this litigation has been detailed in prior opinions of this court: *Ahern v. Asset Management Consultants Inc.* (Aug. 11, 2015, B253974 & B257684) [nonpub. opn.]; *Ahern v. Asset Management Consultants, Inc.* (May 22, 2017, B271851) [nonpub. opn.]; *Ahern v. Chicago Title Company* (May 20, 2021, B304119) [nonpub. opn.].

commission was to be paid by the seller to AMC and related individuals as the buyer's broker. In fact, the true purchase price was $30 million or less and "what was purported to be a commission was an illegal and secret mark-up of the Property purchase price in which the defendants conspired to inflate the price to hide the fact the Property could have been purchased for $30,000,000 or less." That is, the purported real estate commission did not reduce the negotiated purchase price received by the seller, as it would if the seller truly paid the commission, but was added to the negotiated price so that its economic burden was shifted to the investors, thereby diluting the value of the investment.[6]

The BH parties and three related defendants (Gloria Hopper, Argent Associates, LLC and Argent Real Estate Associates, L.P.) demanded arbitration and then petitioned the court to compel arbitration pursuant to the mandatory arbitration provisions in the iStar purchase and sale agreement and the cotenancy agreement. As it related to the iStar agreement, the Ahern parties opposed arbitration, arguing, even if BH & Sons had standing after assigning all its interest in the agreement to the cotenants, the claims in their complaint were

---

[6] The Ahern parties additionally alleged the BH parties and others had misrepresented the likelihood that Cingular Wireless would renew its lease at the property, that a new institutional tenant could be found if Cingular left the premises and that a portion of the loan from PNC Bank would be used to create a reserve account for lost rent in the event of a vacancy. Claims were asserted (among others) for breach of fiduciary duty, intentional misrepresentation, fraud by concealment and unfair business practices under Business and Professions Code section 17200 et seq.

7

outside the scope of the arbitration provision, which was expressly limited to disputes between the seller (iStar) and the buyer (BH & Sons), and did not cover disputes between BH & Sons (and its agents) and the tenant in common investors. The trial court granted the petition based solely on the arbitration provision in the iStar purchase and sale agreement.

Following the court's order the Ahern parties elected not to pursue their claims against the BH parties and the related defendants who had successfully moved to compel arbitration, and voluntarily dismissed the complaint as to them. On January 3, 2013, pursuant to a stipulation between the Ahern parties and the remaining defendants, the court dismissed the complaint's class allegations without prejudice; and the Ahern parties were permitted to proceed individually.

Notwithstanding their dismissal from the litigation, the BH parties initiated arbitration pursuant to the court's order compelling arbitration, seeking a determination their dismissal was with prejudice; a finding they had not orchestrated a fraudulent scheme to induce the Ahern parties to purchase fractional interests in the Amlap property in order to earn a secret profit; and contractual indemnity from Ahern under the tenant in common purchase and sale agreement and from Amlap Ahern under the cotenancy agreement. The Ahern parties did not participate in the arbitration hearing, maintaining their objection that there was no valid arbitration agreement between them and the BH parties and that the arbitrator thus lacked jurisdiction over them.

Proceeding in the absence of the Ahern parties as permitted under the governing arbitration rules, the arbitrator found no merit to the Ahern parties' claims against the

8

BH parties. To the contrary, the arbitrator concluded the Ahern parties' complaint arose from their own breach of their representations and warranties that they were sophisticated investors, had reviewed and understood the various offering and purchase materials, including the descriptions of risk involved in the investment in the Amlap property, and would conduct an independent investigation of facts determined to be material to their investment decision. As a result, the Ahern parties were found liable for $399,000 in contractual indemnity. The superior court confirmed the award and entered judgment in favor of the BH parties.

We reversed the judgment in *Ahern v. Asset Management Consultants, Inc.* (Aug. 11, 2015, B253974 & B257684) [nonpub. opn.], holding the trial court had erred in compelling arbitration and thereafter confirming the arbitration award against the Ahern parties based on the arbitration provision in the real estate purchase and sale agreement between iStar and BH & Sons.[7] We explained that agreement neither established nor governed any relationship between the Ahern and the BH parties. The matter was remanded with directions to the superior court to vacate its September 19, 2012 order compelling arbitration, to deny the BH parties' petition to confirm the arbitration award and to grant the Ahern parties' petition to vacate that award.

---

[7]  Our opinion expressly noted the arbitration provision in the cotenancy agreement had not been the basis for the order compelling arbitration, the arbitration proceedings or the order confirming the award. (*Ahern v. Asset Management Consultants, Inc., supra*, B253974 & B257684 at fn. 1.)

4. *The Amended Pleadings and the New Demand for Arbitration*

The Ahern parties, who had filed a first amended complaint on March 13, 2013, were granted leave to file a second amended complaint on October 13, 2016, which, among other changes, reinstated the BH parties, identified Thomas Ahern as Priscilla Ahern's surviving spouse and conformed certain allegations to be consistent with discovery and investigation following the filing of the first amended complaint. The second amended complaint was filed October 19, 2016.[8]

In December 2016 the BH parties moved to compel arbitration of the Ahern parties' claims based on the arbitration provision in the cotenancy agreement. The Ahern parties opposed the petition, arguing their tenant in common interest in the Amlap property had been acquired through the tenant in common purchase and sale agreement, which did not contain an arbitration provision, and had been promoted through misrepresentations and omissions in the marketing and offering materials. The cotenancy agreement concerned only the management and operation of the investment after its acquisition, they insisted. Accordingly, the narrow arbitration provision in that agreement did not apply to their fraud and breach of fiduciary duty claims. The Ahern parties also argued the cotenancy agreement was void because it obligated BH & Sons to provide services requiring a real estate broker's license, which BH & Sons, as a limited liability company, did not have and could not obtain; AMC and Hopper were not signatories to the cotenancy agreement and could not compel arbitration; Ahern

---

[8] Gloria Hopper, Argent Associates, LLC and Argent Real Estate Associates, L.P. were not named as defendants.

10

was neither a signatory to, nor a party otherwise bound by, the agreement and could not be compelled to arbitrate; and the BH parties had abandoned (waived) any right to compel arbitration under the cotenancy agreement by initially proceeding to arbitration based solely on the iStar purchase and sale agreement.

The trial court rejected the Ahern parties' arguments and granted the motion to compel arbitration on January 27, 2017.[9] With respect to the Ahern parties' argument their claims against the BH parties did not fall within the scope of the arbitration provision in the cotenancy agreement, the court quoted *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401 (*Buckhorn*), which held that, once a valid arbitration agreement has been proved, the burden is on the party opposing arbitration to demonstrate the arbitration clause cannot be interpreted to require arbitration of the parties' dispute (*id.* at p. 1406) and that, even if a plaintiff was not suing on a claim based on a contract that requires arbitration of disputes concerning the enforcement or interpretation of their agreement, tort claims "rooted" in the contract relationship between the parties must be arbitrated (*id.* at p. 1408). The court then explained, "The Aherns attempt to downplay the significance of the Cotenancy Agreement to their claims, arguing that the relationship created by that agreement 'was BH's retention as the cotenants' manager to manage and operate the Amlap Property following its acquisition.' [Citation.] However, the Cotenancy Agreement itself states that '[t]he Cotenants have agreed to join together as

---

[9] The court corrected its order nunc pro tunc on March 13, 2017. The court did not modify its rationale for granting the motion to compel arbitration.

tenants in common to acquire, hold and operate certain Property (defined below) for investment purposes' *and* '[t]he Cotenants desire to enter into this Agreement to arrange for the management and operation of the Property, and to govern the respective rights and obligations of each Cotenant.' [Citation.] Further, as the BH Defendants point out, the Aherns' original complaint had a different view of the Cotenancy Agreement, alleging that 'each [Special Purpose Entity] and the Company were required to enter into a Cotenancy Agreement which passed control of the aggregate investment funds and Property to the HOPPER Defendants [defined to include the BH parties] who were the effective issuer, broker, investment manager and the Property Manager.'"

5. *Arbitration*

In the arbitration proceeding the BH parties demurred to the claims asserted by the Ahern parties (as did the respondents in seven other consolidated arbitration cases involving various participants in the same or similar tenant in common or limited partnership investments, including lawyers, accountants and real estate brokers), asserting each cause of action in the lawsuit, filed nearly six years after the Amlap transaction, was barred by the governing statutes of limitation. Relying on this court's decision in *Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, the BH parties argued the delayed discovery doctrine did not save the Ahern parties' claims because disclosures in the informational materials provided with the tenant in common investments—specifically, the statement in the risk factors section of the property information package that "the Seller would have sold the Property for a lower Purchase Price if it were not obligated to pay such commission"—were sufficient to

12

put the investors on inquiry notice of their claims at the time of the transaction.

Over the Ahern parties' objection they were entitled to an evidentiary hearing on the issue of delayed discovery,[10] the arbitrator ruled it was proper to use a demurrer procedure in an

[10] Ahern has argued he first became aware of the actual purchase price of the Amlap property and the existence of the hidden syndication fee falsely identified as a commission in April 2012 when he was contacted by a lawyer in connection with the lawyer's investigation of a case brought by another investor. He contends nothing between acquisition of the Amlap investment in 2006 and April 2012 put him on notice of this information and he did not suspect, nor did he have reason to discover, that the purchase price for the property, as represented to the investors, had been marked up to include syndication fees to be paid by the investors. To the contrary, periodic property accountings for financial statement purposes provided by AMC and its accountants as part of AMC's asset management services concealed the true facts by classifying the $1.3 million as a tangible asset that was part of land/building values. In fact, according to Ahern, disclosure, tax and accounting rules require syndication fees to be broken out separately as intangible assets reducing land/building values and separately classified in the balance sheet as an intangible asset amortized over 180 months for income tax purposes.

The arbitrator initially scheduled a two-week evidentiary hearing on the limitations issue, but ultimately cancelled the hearing. His ruling recited the general standards for deciding a demurrer, emphasizing, "'Where written documents are the foundation of an action and are attached to the complaint and incorporated therein by reference, they become a part of the complaint and may be considered on demurrer.'" The arbitrator also took judicial notice of our decision in *Stella v. Asset Management Consultants, Inc.*, *supra*, 8 Cal.App.5th 181.

arbitration and sustained the demurrer in its entirety without leave to amend.[11]   In his January 2019 ruling the arbitrator found "the language of the offering Memoranda as to the 'fee' or 'commission' was an unambiguous disclosure that the buyers would be paying money on top of the original purchase price.  If the Claimants thought that there was some sort of fraudulent meaning to this 'fee' or 'commission' then they should have made a full and thorough inquiry before signing the [purchase and sale agreements]."  The arbitrator issued an interim award in favor of the BH parties and other demurring parties in the consolidated proceedings.  In April 2020 the arbitrator adjudicated the issue of attorney fees for the BH parties as prevailing parties and issued a final award.  Following a motion by the Ahern parties, the arbitrator issued a corrected final award on June 24, 2020, rejecting the Ahern parties' requests by making two corrections sua sponte that did not affect the fees awarded.

6.  *Confirmation of the Arbitration Award*

The Ahern parties petitioned to vacate the award or, in the alternative, to correct it.  The BH parties cross-petitioned to confirm the award.  After hearing oral argument, the trial court on September 8, 2020 granted the petition to confirm the award and denied the petition to vacate.[12]

---

[11]     The arbitrator's ruling decided 21 demurrers to the operative complaints or statements of claims in eight consolidated arbitration cases.

[12]     The trial court's order granting the petition to confirm in this case also granted petitions to confirm and denied petitions to vacate a number of other arbitration awards from the underlying consolidated arbitration proceedings.

14

The court ruled the plaintiffs were not prejudiced by the arbitrator's use of a demurrer procedure or his refusal to consider evidence. The arbitrator's ruling, the court explained, demonstrated that his "findings" were derived from a favorable reading of the allegations in the complaint, "which presumably 'contains their strongest statement of th[ose] cause[s] of action.' [Citation.] If the unchallenged allegations in Plaintiffs' detailed complaint could not save their claims, then it is unlikely that immaterial, redundant evidence could." Moreover, although there was no evidentiary hearing, the court continued, the plaintiffs had ample opportunity to present their opposition and counterarguments. The court also ruled the arbitrator did not exceed his jurisdiction when applying the statute of limitations to the claims, pointing out that the plaintiffs' contention statutes of limitation do not apply in arbitration unless explicitly agreed to by the parties was unsupported by any authority and, in any event, at most constituted an unreviewable error of law.

As to the argument the arbitrator lacked jurisdiction because the cotenancy agreement was illegal, the court ruled any illegal aspect of the agreement (the provision of real estate broker services by an unlicensed entity) was severable from the remainder of the agreement, including the arbitration provision. The court rejected various procedural objections to the nature of the findings and ruled the arbitrator did not exceed his jurisdiction in awarding attorney fees.

Judgment was entered in favor of the BH parties and against the Ahern parties on October 28, 2020. The Ahern parties filed a timely notice of appeal.

15

## DISCUSSION

1. *Governing Law and Standard of Review*

Code of Civil Procedure section 1281.2, first paragraph, requires the superior court to order arbitration of a controversy "[o]n petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy . . . if it determines that an agreement to arbitrate the controversy exists."  As the language of this section makes plain, the threshold questions presented by every motion or petition to compel arbitration are whether an agreement to arbitrate exists (*American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. 228, 233 [133 S.Ct. 2304, 186 L.Ed.2d 417] [it is an "overarching principle that arbitration is a matter of contract"]; *Bautista v. Fantasy Activewear, Inc.* (2020) 52 Cal.App.5th 650, 656 ["[u]nder both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate" (cleaned up)]; see *Esparza v. Sand & Sea, Inc.* (2016) 2 Cal.App.5th 781, 787 ["[t]here is a strong public policy favoring contractual arbitration, but that policy does not extend to parties who have not agreed to arbitrate"]) and, if so, whether the parties' dispute falls within the scope of that agreement.  (*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.* (1985) 473 U.S. 614, 626 [105 S.Ct. 3346, 87 L.Ed.2d 444] ["the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute"]; *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*) ["'"a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"'"];

16

*Performance Team Freight Systems, Inc. v. Aleman* (2015)
241 Cal.App.4th 1233, 1244 ["[o]nly disputes that fall within the
scope of an arbitration provision are arbitrable"].)

We review the trial court's interpretation of an arbitration
agreement de novo when, as here, that interpretation does not
depend on conflicting extrinsic evidence.  (*Pinnacle, supra*,
55 Cal.4th at p. 236; *Banc of California, N.A. v. Superior Court*
(2021) 69 Cal.App.5th 357, 367; *DMS Services, LLC v. Superior
Court* (2012) 205 Cal.App.4th 1346, 1352.)  "'Whether an
arbitration agreement applies to a controversy is a question of
law to which the appellate court applies its independent
judgment where no conflicting extrinsic evidence in aid of the
interpretation was introduced in the trial court.'"  (*Jones v.
Jacobson* (2011) 195 Cal.App.4th 1, 12; accord, *Brown v. Ralphs
Grocery Co.* (2011) 197 Cal.App.4th 489, 497.)

"In determining the scope of an arbitration clause, '[t]he
court should attempt to give effect to the parties' intentions, in
light of the usual and ordinary meaning of the contractual
language and the circumstances under which the agreement was
made.'"  (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744;
accord, *Laymon v. J. Rockcliff, Inc.* (2017) 12 Cal.App.5th 812,
820; see Civ. Code, § 1648 ["[h]owever broad may be the terms of
a contract, it extends only to those things concerning which it
appears that the parties intended to contract"].)  As a general
rule, arbitration should be upheld ""'unless it can be said with
assurance that the arbitration clause is not susceptible to an
interpretation covering the asserted dispute.'""  (*Rice v. Downs*
(2016) 248 Cal.App.4th 175, 185; accord, *Ericksen, Arbuthnot,
McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983)
35 Cal.3d 312, 323 ["doubts concerning the scope of arbitrable

17

issues are to be resolved in favor of arbitration"].) "Nonetheless, this policy does not override ordinary principles of contract interpretation. '[T]he contractual terms themselves must be carefully examined before the parties to the contract can be ordered to arbitration . . . .' '[T]he terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested.'" (*Rice*, at p. 185.)

2. *The Trial Court Erred in Compelling Arbitration of the Ahern Parties' Claims Pursuant to the Arbitration Provision in the Cotenancy Agreement*

The Ahern parties' lawsuit seeks to recover for injuries suffered as a result of misrepresentations and material omissions in the marketing and sale of their tenant in common investment in the Amlap property. Those claims did not "aris[e] in connection with the interpretation or enforcement of the provisions of [the cotenancy agreement], or the application or validity thereof" and should not have been ordered to arbitration.

To reiterate, the Ahern parties' tenant in common interest was acquired through the purchase and sale agreement between BH & Sons and Thomas and Priscilla Ahern, which provided BH & Sons was selling to the Aherns an undivided percentage share of the Amlap property and assigning and transferring to them BH & Sons's rights under the iStar purchase and sale agreement with respect to their interest in the property. The purchase and sale agreement recited that the underlying contract price for the Amlap property was $34,550,000 and specified the cost of the Aherns' interest as $1,265,438. The agreement further provided the Aherns were to deliver a deposit upon execution of the agreement to a designated escrow holder and, unless they had exercised their cancellation rights following receipt from BH &

18

Sons of certain additional information, to deliver the total of the purchase price (with various adjustments) three business days before the closing date. The tenant in common purchase and sale agreement, prepared by BH & Sons and AMC and provided by them to the tenant in common investors, contained no arbitration provision.

The cotenancy agreement provided for the operation and management of the Amlap property and the respective rights of the tenants in common in those decisions once the tenant in common interests had been acquired, not the purchase (or marketing) of those interests. Although the purchase and sale and cotenancy agreements were related to each other,[13] the acquisition of the tenant in common interests was accomplished entirely through the purchase and sale agreement. None of the terms for the purchase of the tenant in common interests was contained in the cotenancy agreement; and the alleged misrepresentations and omissions by AMC, BH & Sons and Hopper that induced the Aherns' investment, to the extent based on written materials, occurred in connection with the sale of the tenant in common interests, not the execution of the cotenancy agreement.

a. *The cotenancy agreement contains a narrow arbitration provision*

Significantly, not only did the BH parties elect not to include an arbitration agreement in the tenant in common

---

[13] The tenant in common purchase and sale agreement required execution of the cotenancy agreement: Pursuant to paragraph 6(c) of the purchase and sale agreement, delivery of an executed cotenancy agreement "to govern the respective rights and obligations of each Cotenant" was a condition of closing.

purchase and sale agreement but also the arbitration provision they drafted for the cotenancy agreement was a limited one. As our colleagues in Division One of this court explained in *Rice v. Downs*, *supra*, 248 Cal.App.4th 175, "'[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is "broad" or "narrow."'" (*Id.* at p. 186; accord, *Howard v. Goldbloom* (2018) 30 Cal.App.5th 659, 663-664.) A broad clause includes language that requires arbitration of "'"*any claim* arising from or *related* to"'" the agreement. (*Rice*, at p. 186; see, e.g., *Yuen v. Superior Court* (2004) 121 Cal.App.4th 1133, 1138 [arbitration clause stating all disputes relating to contract shall be submitted to arbitration was "broad"]; *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684, 681 & fn. 2 [agreement to arbitrate "'*any* problem or dispute' that arose under or concerned the terms of the [service agreement]" is "clear," "plain" and "very broad," giving rise to a presumption parties intended to arbitrate claims including tort claims relating to the agreement].)

A narrow clause, on the other hand, typically includes language that requires arbitration of "a claim, dispute, or controversy 'arising from' or 'arising out of' an agreement, i.e., excluding language such as 'relating to this agreement' or 'in connection with this agreement.'" (*Rice v. Downs*, *supra*, 248 Cal.App.4th at p. 186.) Narrow arbitration clauses are generally interpreted "'"to be more limited in scope"'" (*Howard v. Goldbloom*, *supra*, 30 Cal.App.5th at p. 664; *Rice*, at p. 186) and "apply only to disputes regarding the interpretation and performance of the agreement" (*Ramos v. Superior Court* (2018) 28 Cal.App.5th 1042, 1052; accord, *Howard*, at p. 664).

20

The arbitration provision in the cotenancy agreement is particularly narrow, both omitting any general reference to disputes "related to" the agreement and specifically providing for arbitration only of those disputes arising in connection with "the interpretation and enforcement of the provisions of the agreement." The BH parties' efforts to fit the Ahern parties' claims regarding the marketing of the investment into this narrowly drafted arbitration provision in an agreement governing the post-acquisition management of the investment fail.

> b. *The investors did not pool funds through the cotenancy agreement for the purchase of tenant in common interests*

The BH parties' principal argument that the tenant in common investors pooled funds pursuant to the cotenancy agreement to purchase the property is belied by the relevant documents. The funding activity required by the cotenancy agreement and cited by the BH parties relates to advances that may be necessary for "reserves," a term defined by the agreement as "[t]he funds set aside or amounts allocated by the Manager on a quarterly basis for reserves for use as working capital of the Property, to pay taxes, insurance, debt service or other costs or expenses incident to the Property, or for any other purpose related to the operation of the Property." Neither the paragraph potentially requiring advances for reserves nor any other portion of the cotenancy agreement concerned the Aherns' payment of $1,265,438 to purchase an interest in the Amlap property.

To be sure, in recitals before the actual terms of the cotenancy agreement, the parties stated, "A. The Cotenants have agreed to join together as tenants in common to acquire, hold and operate certain Property (defined below) for investment purposes.

21

[¶]   B.  The Cotenants desire to enter into this Agreement to arrange for the management and operation of the Property, and to govern the respective rights and obligations of each Cotenant." The trial court's emphasis on sentence A when ordering arbitration was misplaced.  That sentence simply described the historic background (as demonstrated by the tenant in common purchase and sale agreement), which led to sentence B and its identification of the purpose of the cotenancy agreement—a description repeated, without variation, in multiple documents surrounding this transaction prepared by BH & Sons and AMC. Similarly, reading paragraph 2.1 as a whole, as we must (see Civ. Code, § 1641), the statement the cotenants "have agreed to jointly acquire and operate the Property" does not mean they jointly agreed to acquire the Amlap property through the operation of the cotenancy agreement.  A subsequent sentence in paragraph 2.1 makes clear the agreement "merely [sets] forth the terms and conditions upon which Cotenants shall hold and manage undivided interests in the Property," not the terms and conditions under which those interests were acquired.

The trial court's reasoning notwithstanding, the superseded allegation in the Ahern parties' original complaint that, pursuant to the cotenancy agreement, "control of the aggregate investment funds and Property" was passed to the "Hopper defendants" is also insufficient to bring claims regarding the marketing of the investments within the scope of the cotenancy agreement's narrow arbitration provision.[14]  First, as the Ahern parties

---

[14]      In addition to the language from the original complaint quoted by the trial court when ordering arbitration, the BH parties in their respondents' brief note that in a subsequent paragraph of the original complaint the Ahern parties alleged the

explain, the original complaint's description of the cotenancy agreement as a device for aggregating investor funds was incorrect (and, indeed, inconsistent with the express terms of the cotenancy agreement) and was not repeated in the first amended complaint, filed in March 2013, long before the January 2017 order compelling arbitration, or in subsequent iterations of their pleading. Second, even if the cotenancy agreement had been the conduit for distribution of the allegedly secret buyer-funded commission, as well as for payment of various professional fees relating to the Amlap property transaction, claims based on the BH parties' fraudulent representations during the marketing of the investors' interests would not fall within the scope of the agreement's arbitration provision, which, as discussed, did not broadly encompass any dispute between the parties relating to the cotenancy agreement, but was limited to disputes concerning the interpretation or enforcement of that agreement's terms. (See *Howard v. Goldbloom*, *supra*, 30 Cal.App.5th at pp. 669-671 [claims for breach of fiduciary duty to minority shareholders did not fall within scope of narrow arbitration provisions in plaintiff's employment agreements or stock repurchase agreement with defendants].)

> ### c. *The Ahern parties' extracontractual claims are not "rooted in" the cotenancy agreement*

Neither the "rooted in" concept, as articulated in *Buckhorn*, *supra*, 121 Cal.App.4th 1401, nor Civil Code section 1642's interpretative tool, as applied in *Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667 (*Brookwood*)—authority on which the

---

cotenancy agreement was the vehicle for aggregating funds raised in the offering "to be used to pay legal and accounting fees [and] the secret $1,300,000 AMC commission . . . ."

BH parties rely—supports broadly reading the arbitration clause in the cotenancy agreement to include the Ahern parties' claims.

The "rooted in" concept for determining arbitrability applies in cases involving parties whose employment agreements or other contractual arrangements include a broad arbitration provision. Tort claims that arise from those contractual relationships—that have their roots in it—are subject to arbitration. (E.g., *Coast Plaza Doctors Hospital v. Blue Cross of California*, *supra*, 83 Cal.App.4th at pp. 686, 689 [arbitration required where hospital's complaint was based on insurer's refusal to renegotiate reimbursement rates provided for in contract; "[i]t has long been the rule in California that a broadly worded arbitration clause, such as we have here, may extend to tort claims that may arise under or from the contractual relationship"].) As more recently explained in *Howard v. Goldbloom*, *supra*, 30 Cal.App.5th at page 664, "Broad arbitration clauses are interpreted to apply to extracontractual disputes between the contracting parties, "'so long as they have their roots in the relationship between the parties which was created by the contract.'"" (Accord, *Rice v. Downs*, *supra*, 248 Cal.App.4th at p. 188 ["even under a very broad arbitration provision, such as 'any controversy or claim arising out of or relating to this agreement,' tort claims must "'have their roots in the relationship between the parties which was created by the contract'" before they can be deemed to fall within the scope of the arbitration provision"].)

As the BH parties observe, in *Buckhorn*, *supra*, 121 Cal.App.4th 1401, the court of appeal concluded an arbitration clause in an employment agreement, which all parties agreed covered the wrongful termination claim of a doctor who

24

had been dismissed by a medical group, also applied to the doctor's causes of action for defamation and interference with prospective business advantage even though those alleged torts occurred after termination. Those additional claims were based on allegations the medical group had informed the doctor's patients he was no longer with the group "because of marital problems, mental problems, [or] loss of his insurance coverage, and that he was no longer practicing medicine, or that he had "'just disappeared.""" (*Id.* at p. 1405.) The appellate court held the issue of arbitrability "turns on whether the tort claims are 'rooted' in the contractual relationship between the parties, not when they occurred." (*Id.* at p. 1407.) And his claims were so rooted: They were based on his expectation of future income from his patients, who had consulted him in his capacity as an employee of the defendant medical group. Thus, the court reasoned, the employment agreement "would inform the extent of any economic interest" of the doctor's with which the medical group might have interfered. (*Id.* at pp. 1407-1408.) "Because [the doctor] failed to demonstrate his tort claims were 'wholly independent' of the employment agreement," the court concluded his claims must be submitted to arbitration. (*Id.* at p. 1408.)

Contending the arbitration provision in *Buckhorn* involved a narrow arbitration provision similar to the one in the cotenancy agreement, the BH parties argue the "rooted in" doctrine applies here and the Ahern parties' claims are rooted in the cotenancy agreement. Neither prong of this argument is correct. The original arbitration agreement between Dr. Buckhorn and his medical group was similar to the narrow clause in the cotenancy agreement. It read, "In the event that a dispute arises between the parties concerning the enforcement or the interpretation of

any provisions of this Agreement, such dispute shall be submitted to arbitration for resolution." (*Buckhorn*, *supra*, 121 Cal.App.4th at p. 1404, fn. 1.) But, as the court of appeal explained, a year after Dr. Buckhorn entered into his original professional services agreement with the medical group, the group modified the agreement, which, as amended "provided for mandatory arbitration of '[a]ny dispute between the parties.'" (*Id.* at p. 1404.) The medical group's motion to compel arbitration relied on both the original, narrow clause and the amended, all-encompassing arbitration provision. (*Id.* at p. 1405.) No comparable all-inclusive arbitration agreement existed between the BH parties and the Ahern parties.

In addition, even were we to apply the "rooted in" concept in this case when evaluating the scope of the arbitration provision in the cotenancy agreement, the Ahern parties' claim they were fraudulently induced by the BH parties to invest in the Amlap property has its roots in the contractual relationship between the Aherns and BH & Sons created by the tenant in common purchase and sale agreement, not the cotenancy agreement. (See *Rice v. Downs*, *supra*, 248 Cal.App.4th at p. 188 [to be arbitrable, tort claims must have their roots in the relationship between the parties that was created by the contract containing the arbitration provision].)

> d. *Civil Code section 1642 does not authorize importing the arbitration provision into the tenant in common purchase and sale agreement*

Civil Code section 1642 provides, "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." As an alternative to their position the Ahern parties'

26

claims are "rooted in" the cotenancy agreement, the BH parties, citing only *Brookwood, supra*, 45 Cal.App.4th 1667, argue the cotenancy agreement and the tenant in common purchase and sale agreement should be construed together pursuant to section 1642 and, as a consequence, the arbitration provision in the former applies to disputes involving the latter.

The BH parties misconstrue Civil Code section 1642 when they simplistically contend the terms of one agreement are necessarily incorporated into all other agreements that form parts of a single transaction. As the Supreme Court explained in *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, section 1642 directs courts to construe agreements relating to one transaction in light of one another, not to merge them into a single contract: "'While it is the rule that several contracts relating to the same matters are to be construed together [citation], it does not follow that for all purposes they constitute one contract.' [Citation.] "'[J]oint execution would require the court to construe the two agreements in light of one another; it would not merge them into a single written contract.""" (*Mountain Air Enterprises*, at p. 759; accord, *R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1031.)

The fundamental canon of contract interpretation remains to give effect to the mutual intention of the parties as it existed at the time of contracting. (Civ. Code, § 1636; *Hartford Casualty Ins. Co. v. Swift Distribution, Inc*. (2014) 59 Cal.4th 277, 288; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) That basic principle applies equally to the interpretation of contracts with arbitration provisions. (*Victoria v. Superior Court, supra*, 40 Cal.3d at p. 743.) Civil Code section 1642 is simply one

of the rules referred to in section 1637[15] for aiding in the interpretation of a contract when the intent of the parties is otherwise doubtful.  (See *Subaru of America, Inc. v. Putnam Automotive, Inc.* (2021) 60 Cal.App.5th 829, 838; *Hartford Accident & Indemnity Co. v. Sequoia Ins. Co.* (1989) 211 Cal.App.3d 1285, 1300 ["[S]ection 1642 is simply a rule to aid in the interpretation of contracts and to allow the construction of two contracts together in pursuit of that purpose.  It does not, as Transamerica appears to contend, make two contracts one for all purposes"].)

Here, as reflected in the language of the two agreements, both of which were prepared by the BH parties, the intention is clear that claims arising from the cotenancy agreement would be subject to mandatory arbitration while claims arising from the purchase and sale agreement would not.  This is made plain not only from the fact that only the cotenancy agreement contained an arbitration provision but also from the legal costs provision in the purchase and sale agreement (paragraph 9(d)), which expressly contemplated the tenant in common investor or BH & Sons could initiate a lawsuit or other proceeding before a "court, arbitrator or other authority."  In addition, while not dispositive, that the cotenancy agreement contained an integration clause also weighs against merging its provisions with those of the purchase and sale agreement.  (See *R.W.L. Enterprises v. Oldcastle, Inc.*, *supra*, 17 Cal.App.5th at p. 1031.)

---

[15]     Civil Code section 1637 provides, "For the purpose of ascertaining the intention of the parties to a contract, if otherwise doubtful, the rules given in this Chapter are to be applied."

The decision in *Brookwood*, *supra*, 45 Cal.App.4th 1667, upon which the BH parties rely, is not to the contrary. *Brookwood* involved a lawsuit for wrongful termination/sex discrimination in violation of California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) filed by Johnetta Brookwood against her former employers Bank of America NT & SA (Bank) and BA Investment Services, Inc. (BAIS), a Bank-affiliated company. BAIS hired Brookwood as an investment specialist to promote and sell BAIS's services (mutual funds, stocks and bonds) to Bank's clients; Bank hired Brookwood to sell its annuities. (*Id.* at pp. 1670-1671.) Brookwood signed a registered representative agreement with BAIS that recited she was "'dually employed by [Bank] pursuant to an additional employment agreement'" that contained an arbitration provision. In addition, Brookwood transferred to BAIS her existing registration with the National Association of Securities Dealers (NASD) using a U-4 form, which mandated arbitration of any dispute between her "and my firm, or a customer, or any other person" that was required to be arbitrated under NASD rules. (*Id.* at p. 1672.) On the same day Brookwood signed an employment agreement with Bank, which acknowledged her dual employment with BAIS; provided that Bank or BAIS could terminate Brookwood's employment at any time, with or without cause; and specified that termination by BAIS automatically terminated her employment by Bank unless Bank determined otherwise. That agreement contained no arbitration provision. (*Ibid.*)

The court of appeal affirmed the order compelling Brookwood to arbitrate her wrongful termination claims against both BAIS and Bank, holding substantial evidence supported a

29

finding that Bank's contract, BAIS's contract and the U-4 transfer form were parts of substantially one transaction and should be taken together. (*Brookwood*, *supra*, 45 Cal.App.4th at p. 1675.)[16] The court explained, "Bank and BAIS are related companies that hired plaintiff at the same time in a dual capacity with principal responsibilities that required a securities registration. This evidence supports a finding that the employment agreement for salaried employees, registered representative agreement, and U-4 form, were parts of substantially one transaction and should be taken as one. Thus, the arbitration covenant in the [r]egistered representative agreement, U-4 form, and incorporated NASD provisions ran between plaintiff and Bank notwithstanding there was no specific arbitration provision in the employment agreement for salaried employees." (*Id.* at pp. 1675-1676.)

Given the express acknowledgement in the agreements of Brookwood's dual employment, her simultaneous termination by the two related entities, and the fact her FEHA claims against BAIS were unquestionably subject to arbitration, the conclusion her FEHA claims against Bank should also be arbitrated—that the parties intended Brookwood's fully intertwined, contemporaneous employment relationships with the two entities be treated in the same manner—is unremarkable. Here, in contrast, even if considered parts of substantially one

---

[16] The court of appeal first rejected Brookwood's primary claim that arbitration should not be compelled because she did not know the registered representative agreement and U-4 form required arbitration. (*Brookwood*, *supra*, 45 Cal.App.4th at pp. 1673-1674.)

transaction,[17] no comparable interrelationship of the tenant in common purchase and sale agreement and cotenancy agreement existed.  The purchase and sale agreement (and the property information package that marketed the investment) concerned acquisition of the Amlap property by the investors.  The cotenancy agreement governed management and operations of the Amlap property once the investment had been made.  And as discussed, the separate agreements, covering distinct and successive phases of the Amlap investment, contained different provisions relating to dispute resolution, with nothing in the tenant in common purchase and sale agreement suggesting arbitration was mandatory.

In sum, the Ahern parties' lawsuit does not involve the interpretation or enforcement of a provision of the cotenancy agreement; their claims are not "rooted in" the cotenancy agreement; and applying Civil Code section 1642's interpretative tool does not justify requiring arbitration of a dispute that relates to the acquisition of the Amlap investment, not to its management and operation.  The trial court erred in ordering arbitration in January 2017, and the ensuing order confirming

---

[17] The issue on appeal in *Brookwood* was whether substantial evidence supported the trial court's implied finding that Bank's contract, BAIS's contract and the U-4 form were substantially one transaction and should be taken together.  (*Brookwood*, *supra*, 45 Cal.App.4th at p. 1675.)  The trial court here concluded the controversy came within the scope of the cotenancy agreement's arbitration provision and did not consider, explicitly or implicitly, whether a dispute relating only to the purchase and sale agreement should nonetheless be subject to mandatory arbitration.

the arbitration award and judgment in favor of the BH parties must be reversed.

## DISPOSITION

The judgment confirming the arbitration award is reversed. The matter is remanded with directions to deny the petition to confirm the arbitration award, to grant the petition to vacate the award and to vacate the January 27, 2017 order compelling arbitration. The Ahern parties are to recover their costs on appeal.


                                        PERLUSS, P. J.

We concur:



        SEGAL, J.



        FEUER, J.

32